IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs in Knoxville, November 28, 2017

**STATE OF TENNESSEE v. KIMBERLY JOHNSON HART**

**Appeal from the Circuit Court for Maury County**
**No. 24609     Robert L. Jones, Judge**

_____

**No. M2016-02365-CCA-R3-CD**

_____

A Maury County jury convicted the Defendant, Kimberly Johnson Hart, of facilitation of possession with intent to sell one-half ounce or more of marijuana and facilitation of possession with intent to sell less than two pounds of tetrahydrocannabinol, a schedule VI narcotic.  The trial court sentenced the Defendant to concurrent terms of eleven months and twenty-nine days for each conviction, thirty days to be served in jail, with the remainder to be served on supervised probation.  On appeal, the Defendant asserts that the evidence is insufficient to support her convictions and that the trial court erred when it denied her request for judicial diversion.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, J., joined.

L. Samuel Patterson, Columbia, Tennessee, for the appellant, Kimberly Johnson Hart.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Brent A. Cooper, District Attorney General; and Patrick F. Powell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. At Trial**

This case arises from the Defendant's retrieving packaged items containing illegal substances from the post office.  For her role, a Maury County grand jury indicted the Defendant for possession of marijuana with intent to sell and possession of

tetrahydrocannabinol with intent to sell. At trial, the parties presented the following evidence: Brad Mahs, a Postal Inspection Service federal agent, testified that his job was to investigate "any crimes associated with mail," which often involved the investigation of narcotics in the mail.

Agent Mahs testified that he monitored Postal Service data bases looking for packages with a similar weight and dimensions and consecutive numbers on express mail labels that are mailed between two areas. Agent Mahs said that, in his experience, packages with these characteristics are narcotics and then the return packages are money. It was this process that began Agent Mahs's investigation in this case when he found between eleven and sixteen packages with the "same labels, consecutive numbers on packages, lots of the same addresses and names" sent to Columbia, Tennessee. Agent Mahs stated that many of the packages were shipped to 2019 Westwood Drive, the Defendant's former residence. Packages were also sent from a Colorado address to two other addresses, 819 West 9th Street and 314 Caldwell Drive, both associated with the Defendant. On return packages from these residences, the Defendant's name was used as well as the name "Cody Brown."

Agent Mahs identified a photograph of two handwritten express mail labels sent to an address in Monument, Colorado with the return address of "Kimberly Hart, 2019 Westwood Drive." He also identified a photograph of an express mail label coming from Colorado to 2019 Westwood Drive addressed to "B. Woodruff." Another photograph depicted an express mail label from "Salus Natural Body Care" to "B. Brown" at 2019 Westwood Drive. The package weighed approximately fourteen pounds, and the postage fee was $93.00. A fourth photograph depicted a label addressed to 2019 Westwood Drive from Salus Natural Body Care. The packaged weighed almost twenty pounds and the postal fee was $112.75. Agent Mahs stated that "close to eleven" packages with similar characteristics were associated with the Defendant's addresses.

Agent Mahs testified that he found the fact that the labels were handwritten was of note. He explained that express mail is "so expensive" that it is "usually" used by businesses that have a "pre-print plan" through the postal service and, thus, the labels are printed, not handwritten. About the particular package at issue in this case, on May 5, 2015, the post office notified Agent Mahs that the package was at the post office and "some people [] had called numerous times to pick it up as well as com[e] to the Post Office two times at least to pick up that package." Agent Mahs identified the express label on the package that was addressed to "B. Brown, 2019 Westwood Drive, Columbia" from Colorado. Pictures of the marijuana contained in the box were entered into evidence. Notes attendant to the package indicated a female caller had requested the package be redelivered from the Westwood address to 314 Caldwell Drive. This second address was also associated with the Defendant.

2

Agent Mahs testified that, given all the "indicators" with this package, he requested the police department have a K-9 officer "run the package" to verify his suspicions of narcotics. The police department complied with the request, and the K-9 officer "alerted" to the presence of narcotics. Meanwhile, "[t]he customer" had called trying to "get a hold of the package." The caller left a cell phone number and name. Agent Mahs called the number and spoke with the caller, the Defendant, notifying her that her package was available for pick-up. The Defendant came to the post office to retrieve the package. The Defendant provided her identification, signed for the package and left the post office. Agent Mahs described the Defendant as "[o]verly suspicious" in her demeanor.

Agent Mahs testified that the Defendant began walking toward a nearby Fred's store when police officers stopped her to inquire about the package. One of the officers opened the package, the marijuana was found, and the Defendant taken into custody. After being transported to the police department, Agent Mahs interviewed the Defendant. During the interview, the Defendant admitted that she had been the person checking on the package and that it was her cell phone Agent Mahs had earlier called. This phone number was the same number listed on the packages going back to Colorado. The Defendant also admitted that she had lived at both the Westwood and Caldwell addresses that had been listed on the packages Agent Mahs had been monitoring. She stated that she had recently purchased and moved into a new residence. Agent Mahs recalled that the explanation that the Defendant provided for her possession of the marijuana was "pretty convoluted" and varied. The Defendant told Agent Mahs that she was picking the package up for her nephew and then said she was picking the package up for her sister. Later, she said that her father told her the package was at the post office and that she was picking it up at his request. She also told Agent Mahs that "[a]nything important she had sent [to the Westwood] address because her dad is always at home." The Defendant stated in her interview that she had believed that the package was figurines, a housewarming gift from her sister. Later in the interview, she contradicted this statement, saying that she did not think her sister had "got her something" because her sister did not have any money. The package containing the marijuana had cost $40.00 to ship.

Agent Mahs testified that, to his knowledge, no one else had ever checked on the package other than the Defendant. Postal employees reported that the Defendant had come with someone else with her to check on the package, but she was always present. Agent Mahs testified that, in his experience, narcotic packages often list a name different from the name of the person picking up the package.

On cross-examination, Agent Mahs testified about the express mail labels sent from the Defendant to Monument, Colorado. He agreed that he did not know the

3

contents of the packages associated with the labels. About the package mailed from Salus Beauty to the Westwood Drive address that Agent Mahs had earlier testified about, Agent Mahs stated that he was unaware of who picked up that package. Agent Mahs testified that, through the course of his investigation, he learned that the "B.Brown" listed as the recipient on the package the Defendant picked up from the post office on May 5, 2015, was the Defendant's sister, Betsy Brown. He further confirmed that, during the interview, the Defendant never admitted to ownership of the marijuana.

On cross-examination, Agent Mahs testified that during the course of his investigation he learned that Betsy Brown and Cody Brown, the Defendant's sister and nephew, respectively, also "used" the Westwood address for a period of time. Agent Mahs confirmed that it was his understanding that the Defendant had lived with her parents at the Westwood address, then moved to the Caldwell address, and recently moved to the West 9th address.

On redirect examination, Agent Mahs testified that, to his knowledge, neither Betsy Brown nor Cody Brown ever possessed the box of marijuana; however, the Defendant had possession of the box of marijuana at the time she was taken into custody.

Rebecca Hernandez, a Tennessee Bureau of Investigation ("TBI") forensic scientist, testified as an expert witness in the field of Forensic Chemistry. Ms. Hernandez stated that she examined two substances submitted in this case: 1) a plant material, and 2) a brown substance. The plant material was 447.2 grams, almost a pound, of marijuana, and the brown substance was 32.40 grams of tetrahydrocannabinol, both Schedule VI substances.

Jeff Seagroves, a Columbia Police Department narcotics investigator, testified as an expert witness in the field of narcotics investigation. Officer Seagroves testified that he executed a search warrant of the package the Defendant retrieved from the post office. He recalled that he detained the Defendant and advised her that he had a search warrant for the package. The package was opened, and he observed a "vacuum sealed type bag" containing what appeared to be marijuana. Officer Seagroves said that the tetrahydrocannabinol, which he termed marijuana wax, was later weighed and determined to be a little more than an ounce.

Officer Seagroves testified that, based upon his experience, a "user" normally purchased between a few grams to an ounce of marijuana at a time. He stated that only occasionally would he see a half ounce to an ounce purchased by someone for use. More commonly it is lower amounts. Officer Seagroves estimated that "high grade marijuana" was sold for between forty to sixty dollars a gram and that the marijuana wax was sold for approximately forty dollars a gram. In his experience, the amounts of marijuana and

4

marijuana wax found in the Defendant's possession were not for use but were consistent with the amount of marijuana used for resale. Officer Seagroves testified that the Defendant was in possession of the narcotics within 1,000 feet of a school zone. Officer Seagroves stated that King's Daughters' School is located approximately 574 feet from the front door of the post office where the Defendant had exited in possession of the narcotics.

Hunter Kready, a Columbia Police Department narcotics investigator, testified that he participated in the interview of the Defendant. Officer Kready recalled that the Defendant's explanations did not "make sense." He said that she seemed to be "very confused" during the interview, and she provided different "stories" about the package. The Defendant, at one point, said she had received other packages at her address but later said that she had not received other packages. With the knowledge that the package contained marijuana, the Defendant was asked "what could she have done with the package?" She responded, "whatever [her father] told her to do with the package." The Defendant said that she "thought" the package was from her sister. Although, later in the interview the Defendant said that her sister did not have "enough money to send her anything." Officer Kready confirmed that the postage alone for the package was $40.50. At some point, the Defendant stated that she was picking up the package for her sister.

Officer Kready testified that he asked the Defendant about her behavior when she exited her vehicle before entering the post office. The Defendant was "looking around and acting a little suspicious." As an explanation for her behavior, the Defendant told the officers that "a friend's mother had been mugged or raped" during the day outside the post office. She later said that she was looking for her sister. She could not explain why she would be looking for her sister when she was either picking the package up for her sister or the package was from her sister. The Defendant agreed with Officer Kready that her story did not make sense to her either. The Defendant denied ownership of the package but refused to disclose the identity of the owner of the package.

Officer Kready testified that the Defendant confirmed her telephone number during the interview. Defense counsel stipulated that this was the same phone number on the label of the package containing the marijuana and marijuana wax. Officer Kready recalled that the Defendant stated that her ex-husband had worked at the post office and "taught her a lot" about what types of things were mailed.

On cross-examination, Officer Kready testified that during the interview, the Defendant stated that if she anticipated receiving something "important" in the mail, such as checks, she would send them to her father's address on Westwood Drive because she knew that her father checked his mailbox every day at 11:00 a.m. and would retrieve the item. She said she was "scared to have stuff sent to her house." About the Defendant's

statement that she was acting nervous outside the post office because her friend's mother had been raped, Officer Kready agreed that the Defendant had also disclosed that she had been raped before, and this caused her to be "leery." He then reiterated that the Defendant later changed her story to say she was looking for her sister.

Jonathan Hardison, a Columbia Police Department officer, conducted surveillance of the post office on May 5, 2015. Officer Hardison was to watch the post office for someone picking up a package that a K-9 officer had alerted to as containing narcotics. Officer Hardison did not know who would be picking up the package, but he was looking for suspicious behavior. The Defendant, driving in a mini-van, parked in the last parking stall to the left of the post office. When she exited the vehicle she did not walk in front of the vehicle to the sidewalk that leads to the post office, but walked to the rear of her vehicle and looked around from behind the back corner of the mini-van. The Defendant then walked "maybe two cars up, stopped again, ducked in between two cars, looked around, stepped out, kept looking around, then she walked all the way to the front door." Once at the front door, she put her hand on the door, then stopped, backed up, turned around and began looking around again. She then entered through the front door of the post office. Based upon these actions, Officer Hardison became suspicious that she was the person there to pick up the package. Shortly thereafter, the Defendant emerged from the post office holding a white box to her chest.

Officer Hardison testified that, upon exiting the post office, the Defendant once again, "looked around" before walking the opposite direction from her vehicle toward a "Fred's." Officer Hardison participated in the Defendant's interview and asked her about how she entered the post office. The Defendant responded that she just walked in the post office like "everything was normal." Officer Hardison then confronted the Defendant with his observations of her behavior in the parking lot. The Defendant then "bounced from different explanation to explanation," with none of her explanations making sense. She claimed a friend had been mugged at the post office but was unable to provide the friend's name. She then claimed she was looking for her sister.

The parties stipulated that King's Daughters' School was a school as contemplated by the Drug-Free School Zone statute.

The Defendant then testified that she was sixty-one years old and had no prior criminal record. At the time of this incident, she worked at the Tennessee Children's Home as an alcohol and drug counselor. She stated that she had received her Bachelor's degree and was a licensed alcohol and drug counselor. The Defendant said that her employment was terminated following her arrest in this case. She said that on May 5, 2015, she had just moved into her new home on West 9th from her prior residence on

Caldwell Drive, where she had lived for a year.  Before the Caldwell residence, she lived at her parents' residence at 2019 Westwood Drive for a year.

The Defendant testified that in May 2015, her nephew lived in Antioch, Tennessee.  The Defendant said that she received temporary custody of her nephew when he was a baby, which extended until he was eighteen.  Her nephew had last lived with her when he was nineteen, and he was now thirty-three years old.  The Defendant's sister, Betsy Brown, lived with the Defendant at the Caldwell address for most of the time that the Defendant resided there and was living there at the time that the Defendant moved to the West 9th address.  The Defendant was employed while her sister was "not much" employed.

The Defendant testified that, at some time around May 5, 2015, her father had been complaining that her sister's, her nephew's, and her mail had been sent to his house and "it aggravated him."  She then stated, "So, my mother has dementia and I really believe that the mail went back to the Post Office because I think he's the one that told me about the package. . . . I don't remember."  When asked if her sister or nephew ever mentioned the package, the Defendant said, "[y]es."  The Defendant explained that her sister had bought her a housewarming gift.  She stated, "I knew she did and that would have been a big deal for her because she didn't have any money, not a lot at all."  The Defendant confirmed that her sister told her there was a package for her at the post office.  When asked if her nephew told her about the package, she said, "I think he did."  She said that her nephew had spent the night at her house on May 4 to help her with moving.

The Defendant testified that she went to the post office on May 4, 2015, to get the package.  She recalled that her nephew was with her because he had been helping her with the move.  When she entered the post office that day, she believed she was picking up the housewarming gift of collectible figurines; however, the package was not there.  On the following day she was working around her house when she received a phone call from "Brad" telling her that her package was available to be picked up.  The Defendant said that her sister was at her house at the time and said she needed cigarettes.  The Defendant told her sister she was going to get the package, and then her sister "disappeared."  The Defendant thought her sister was going to get the cigarettes or could have been going to get the package.  The Defendant stated that she "went on" and "was just going to go to Fred's" but then thought, "well, I might as well get the package."  She agreed that she acted suspiciously outside the post office.  She explained that she was always "nervous" when she is out because she had been raped two times and her friend's mother, Ms. Stewart, was "mugged" in "broad daylight" in front of Fred's.

The Defendant testified that she did look around before walking into the post office.  She explained that she believed that her sister might show up to ask her to buy her

7

cigarettes. She said that she thought this because "that's something [her sister] would do." She said she often bought her sister cigarettes because she was employed while her sister was not. The Defendant said that, once inside the post office, she showed an employee her identification, but the employee refused to give her the package because it was not her name or address on the package. The Defendant said she turned to leave and Agent Mahs stopped her, saying, "Wait a minute, as long as she's got a legal ID, she can have the package." The postal employee gave her the package, and she walked out. The Defendant said she was walking to Fred's when she was surrounded by the police.

The Defendant testified that the officers asked her what was in the box, and she told them that she believed it was a housewarming gift of figurines. The police asked if they could search the box, and she told them she could not give consent because her name was not on the box. The officers opened the box and found marijuana. They handcuffed the Defendant and transported her to the police station. The Defendant said the interview at the police station lasted a long time and multiple officers spoke with her. She agreed that she was nervous. About her comments to the police about her ex-husband, the Defendant explained that she was married to him for six months approximately fifteen years ago. Her ex-husband no longer worked for the post office because he got "in trouble," but it was not drug-related. The Defendant stated that during the interview she told the officers numerous times that it was not her marijuana. She testified that she did not know "for certain" who the marijuana belonged to but that the drugs were not hers.

The Defendant testified that her nephew had received numerous packages from Colorado at her residence. She said that one of the packages contained tools and another was a pair of shoes but that she was unaware of the contents of some of the packages. She stated that in 2014 and 2015 her nephew worked at festivals selling flags, hats, and t-shirts. She said that she believed that some of the boxes mailed to her nephew contained these items that he sold. The Defendant denied seeing drugs at her home or at her father's residence.

On cross-examination, the Defendant testified that, although she had testified that she believed the package contained figurines, no one had ever told her the package held figurines. The Defendant agreed that when the police officers opened the package that the substance inside looked like marijuana. The Defendant agreed that she had called the post office to check on the package and provided her cell number, the same number on the package, for the post office to contact her when the package was ready. On redirect examination, the Defendant testified that she had never sold drugs before but had used marijuana approximately ten years ago.

After hearing this evidence, the jury convicted the Defendant of facilitation of possession with intent to sell one-half ounce or more of marijuana and facilitation of

possession with intent to sell less than two pounds of tetrahydrocannabinol. At a subsequent sentencing hearing, the trial court sentenced the Defendant to concurrent terms of eleven months and twenty-nine days for each conviction, with thirty days to be served in jail and the remainder of the sentence to be served on supervised probation.

### B. Motion for New Trial

Following a sentencing hearing, the Defendant filed a motion for new trial. Among other issues raised, the Defendant contended that "The Court erred in not sentencing the Defendant to post-plea diversion." That statement is also the extent of the argument in the motion as it related to this issue. There is no transcript of the sentencing hearing in the record; however, at the motion for new trial hearing, Counsel referenced testimony at the sentencing hearing as it related to the trial court's consideration of diversion. The Defendant's attorney argued that at the sentencing hearing it "seemed" that the Defendant's statement about the fact that she would "rather go to jail instead of, you know, instead of, you know, saying something, you know, about [her] nephew or sister," is what most "bother[ed]" the trial court as it considered diversion. Defense counsel asked the trial court to reconsider its denial of diversion in light of the Defendant's lack of any criminal history, her gainful employment, and the fact that the offenses are misdemeanors.

The State then responded by referencing, *State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998), and the factors for consideration when considering judicial diversion. The trial court stated:

> Well, I specifically did not go through them, and I did not have that case, or that list of factors in front of me at the time. But in a generalized sort of way, I think all of that was absorbed by me and considered, at least indirectly.

The State then responded:

> [W]hile Your Honor didn't go through bullet-point by bullet-point, I do remember the discussion of her criminal record, of the circumstances of the events. I do remember a conversation by Your Honor to more or less everyone of these issues.
>
> I think one of the issues being kind of going between the deterrence value and serving the interest of the public, as well as the accused. One of the issues I think Your Honor mentioned was that she was an alcohol and drug counselor and that it concerned Your Honor the possibility of

diversion because she may be able to resume a position of that type with having done this kind of action relating to the distribution of drugs. I think that does go to deterrence. And I think it does go to the interest of the public that someone with that kind of issue in their . . . actions does not continue to be an alcohol and drug counselor. I think, you know, it does go to the deterrence.

And then obviously Your Honor talked at length about some of the circumstances of the offense that I think also go to the denial of . . . the diversion.

In denying the Defendant's motion to reconsider its denial of diversion, the trial court made the following findings:

The most influential factor for me in deciding what to do with this case, and the one thing I disagree with [defense counsel] pretty strongly about in his argument, he said, "she doesn't know whose stuff this is." I don't think the jury believes that. . . . I don't believe that. . . .

She didn't go to the Post Office all those days without knowing who told her she had something coming. And I'm not impressed with the figurine's argument. I've ordered things, mail-order a lot of things, you don't get that excited about - - you want it to come quickly but you don't get that excited about it having to come quickly.

And the main point I made at sentencing is that there's a criminal enterprise here going on involving at least one person in this extended Brown family. And [the Defendant] knows who that is. And [the Defendant] made a conscious decision to go to this Post Office multiple times to pick up one of these multiple packages that came in and in doing so, protected the real guilty person. And she persevered in that protection of the guilty person during that long interrogation that you've talked about, Mr. Patterson. And as far as I know, she's persevering in that effort to protect the guilty at this time.

Now you make a lot of points about her lack of a prior history, her age, her amenability to correction and rehabilitation. All those things weigh in her favor. And if you look at what the Court did, the Court suspended 11/12th's of her sentence. . . .

10

But she made a conscious decision to protect somebody else, and it's going to cost her 15 days of her liberty to do that, unless you convince the [Appellate] Court that I did not articulate well enough all the reasons that I subtly considered in denying her outright probation and in denying her diversion.

People that steal from a bank don't need to be diverted on bank theft charges so they can go back and get another job at the bank. And people that work in the drug and alcohol rehab industry don't need to get diversion so that they can return to that industry and work among the people that may be their customers or the customers of the family member being protected.

## III. Analysis

On appeal, the Defendant contends that the evidence is insufficient to support her convictions and that the trial court erred when it denied her request for judicial diversion.

## A. Sufficiency of the Evidence

The Defendant asserts that the evidence supporting her convictions is insufficient. Specifically, she argues that the State failed to show that she knowingly possessed marijuana and marijuana wax. The State responds that the evidence is sufficient to support the jury's verdict. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v.*

*Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

In Tennessee, "[i]t is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(4) (2014). Marijuana is classified as a Schedule VI drug, *see* Tenn. Code Ann. § 39-17-415(1) (2014), and possession with the intent to sell or deliver not less than one-half ounce nor more than ten pounds of marijuana is a Class E felony. *See* T.C.A. § 39-17-417(g)(1). Likewise, a Schedule VI controlled substance defined as a non-leafy, resinous material containing tetrahydrocannabinol, containing not more than two pounds (2 lbs.) (905 grams) of hashish is a Class E felony.

12

Our criminal code provides that "[a] person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a) (2014). The Sentencing Commission Comments to this section explain, "The section states a theory of vicarious responsibility because it applies to a person who facilitates criminal conduct of another by knowingly furnishing substantial assistance to the perpetrator of a felony, but who lacks the intent to promote or assist in, or benefit from, the felony's commission."

The evidence, considered in the light most favorable to the State shows that the Defendant, on May 5, 2015, came to the post office, provided her identification and picked up a package addressed to her address and displaying her cell phone number. The package contained almost a pound of marijuana, and 32.40 grams of tetrahydrocannabinol. The testimony at trial established that several packages had been sent to the Defendant's addresses from a Colorado address and that several packages bearing the Defendant's name were sent back to Colorado. From this evidence, the jury could infer that the return packages were payment by the Defendant to a supplier, establishing knowledge and intent. Furthermore, the testimony at trial showed that the Defendant was likely the only one in the household with the financial means to pay for the delivery. The Defendant's suspicious behavior, both before and after the delivery, is also circumstantial evidence of the Defendant's knowledge and intent.

Accordingly, we conclude that there was sufficient evidence presented for the jury to find beyond a reasonable doubt that the Defendant was guilty of facilitation to possess with intent to sell marijuana and marijuana wax. The Defendant is not entitled to relief.

## B. Judicial Diversion

The Defendant argues that the trial court erred when it denied her judicial diversion. The State correctly notes that the Defendant has failed to provide us with a record of the sentencing hearing. We agree with the State that the Defendant failed to provide an adequate record for review by not including a transcript of the sentencing hearing. It is the defendant's duty to provide a record that is sufficient "to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal," Tenn. R. App. P. 24(a). Further, a defendant who fails to make an argument on an issue or to provide appropriate citations to the record waives the issue on appellate review. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). The Defendant has risked waiver of the sentencing issue.

13

In our view, based upon the record before us, the Defendant is not entitled to relief on the sentencing issue. When a defendant is eligible for judicial diversion, a judge has the discretion to defer proceedings without entering a judgment of guilty. T.C.A. § 40-35-313(a)(1)(A) (2014). The statute states that a trial court may grant judicial diversion in appropriate cases. *Id*. Following a grant of judicial diversion, the defendant is on probation but is not considered a convicted felon. *Id*. To be eligible for judicial diversion, a defendant must be a "qualified defendant" as defined by the Tennessee Code section governing judicial diversion. T.C.A. § 40-35-313(a)(1)(B)(i) (2014). Eligibility does not automatically entitle the Defendant to judicial diversion. *State v. Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000). "[W]hether an accused should be granted judicial diversion is a question which addresses itself to the sound discretion of the trial court."

Once a defendant is deemed eligible for judicial diversion, the trial court must consider several factors when deciding whether to grant judicial diversion. Due to the similarities between pre-trial diversion, which is administered by the district attorney general, and judicial diversion, courts draw heavily from pre-trial diversion law and examine the same factors:

[A court] should consider the defendant's criminal record, social history, mental and physical condition, attitude, behavior since arrest, emotional stability, current drug usage, past employment, home environment, marital stability, family responsibility, general reputation and amenability to correction, as well as the circumstances of the offense, the deterrent effect of punishment upon other criminal activity, and the likelihood that [judicial] diversion will serve the ends of justice and best interests of both the public and the defendant.

*State v. Cutshaw*, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997).

When the trial court considers the common law factors, "specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion," this Court will "apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *State v. King*, 432 S.W.3d 316, 327 (Tenn. 2014). Our Supreme Court has stated:

Although the trial court is not required to recite all of the *Parker* and *Electroplating* factors when justifying its decision on the record in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case

14

before it. Thereafter, the trial court may proceed to solely address the relevant factors.

*Id*. Failure to consider the common law factors results in loss of the presumption of reasonableness, and this Court is required to conduct a *de novo* review or remand to the trial court for reconsideration. *Id.*

The transcript from the motion for new trial hearing demonstrates that the trial court considered the factors and identified those specifically applicable to this case. The trial court considered the seriousness of the Defendant's offenses and the impact on the community with which she works as a drug and alcohol counselor. It further considered the Defendant's lack of candor with the police and the court as to the identity of the owner of the marijuana and the marijuana wax. The trial court also considered factors weighing in favor of a grant of diversion, such as the Defendant's lack of any criminal history and her amenability to correction. In considering all the factors the trial court concluded that the Defendant's facilitation of the transfer of drugs, given her role in the community as a drug and alcohol counselor, outweighed the factors favoring the grant of judicial diversion.

Our review of the record reveals that there is substantial evidence to support the trial court's sentencing decision. At least eleven packages, coming from and going to Colorado, were associated with the Defendant's addresses coming from and going to Colorado. The Defendant's name and/or phone number appeared on some of the packages. The Defendant disclaimed ownership of the drugs that she had actively sought to pick up from the post office but refused to provide the name of the owner of the drugs. The trial court considered the Defendant's lack of credibility and gave great weight to the fact that the Defendant was involved in the sale of controlled substances while working as a drug and alcohol counselor. Based upon this evidence, we cannot conclude that the trial court abused its discretion in denying the Defendant judicial diversion. The Defendant is not entitled to relief as to this issue.

## III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE